175 N.J. Super. 503 (1980)
420 A.2d 365
GLORIA FLODMAND AND JOHN FLODMAND, PLAINTIFFS-APPELLANTS,
v.
STATE OF NEW JERSEY; DEPARTMENT OF INSTITUTIONS & AGENCIES, ITS AGENTS, SERVANTS AND EMPLOYEES; ANN KLEIN; WILLIAM H. FAUVER, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 15, 1980.
Decided September 29, 1980.
*505 Before Judges ALLCORN, KOLE and PRESSLER.
Bruce M. Schragger argued the cause for appellants (Schragger, Schragger & Lavine, attorneys; Nancy R. Lichtenstein on the brief).
Thomas F. Marshall, Deputy Attorney General, argued the cause for respondents (John J. Degnan, Attorney General, attorney; Erminie L. Conley, Assistant Attorney General, of counsel; Robert J. Haws, Deputy Attorney General, on the brief).
The opinion of the court was delivered by PRESSLER, J.A.D.
*506 This appeal requires us to consider the scope of the State's statutory tort immunity in the context of personal injuries sustained by a visitor to a correctional facility.
The record before us on plaintiffs' appeal from summary judgment dismissing their complaint on the immunity ground is regrettably sparse. We are able, however, to extract therefrom facts which, if proved, raise sufficient question as to the viability of the immunity defense to have precluded the summary dismissal of the action.
The events here involved took place in December 1975 at a state-owned facility known as Knight Farm, which was then being used by defendant Department of Corrections (Department) as a "satellite honor camp" in conjunction with its operation and administration of the Yardville Youth Reception and Correction Center. The Knight Farm operation is described in an affidavit of Thomas F. Lynch, who was Superintendent of Yardville in 1975 and now serves as an Assistant Commissioner of the Department. According to Lynch, Knight Farm, at the time in question, was no longer being used as an inmate residence facility but rather, apparently, for the conduct of two day-time activities. One was a piggery operated by Yardville inmates under custodial supervision. The other, which is the one here involved, was a "community correctional program" known as Yardfields. The Yardfields program involved two categories of participants: a group of Yardville inmates trained as paraprofessionals, presumably in the field of social work, and a group of juveniles who had been adjudicated delinquents by the Mercer County Juvenile and Domestic Relations Court and had been placed on probation with suspended sentences to either Yardville or Jamesburg Training School. The program was evidently conceived of as affording rehabilitation therapy and counseling for the juveniles and a social-work type of career and educational experience for the inmates. The interaction between the juveniles and the inmates was, according to the way the program was conceived and structured, conducted without any custodial supervision but apparently with some noninmate professional supervision.
*507 The record does not indicate either the nature of the professional supervision or the number of participants in the program or the number of days or hours a day of its conduct. Nor does it indicate specifically how the participants were transported to Knight Farm, although it appears that the inmate participants were transported to and from Yardville as a group. Also absent from the record is any clear description of the physical layout of Knight Farm. While we do know that there was one building thereon in which the Yardfields program was conducted, we know nothing regarding egress, ingress, fencing, size or other relevant physical details. Finally, while Lynch asserts unequivocally that "no unauthorized persons," including visitors, were permitted to be on the grounds on Knight Farm, there is nothing in the record to suggest that entry thereon by members of the general public was in any way inhibited at any time, either by guards, gates or even posted notices.
Plaintiff Gloria Flodmand (her husband sues per quod) was in 1975 employed as a waitress at a restaurant in the general neighborhood of Knight Farm. She apparently had become friendly with a Yardville inmate who had worked with her in the restaurant while he was on a work-release program. When he was about to be discharged from Yardville he apparently obtained her agreement to take an interest in another inmate, Joe, who was an inmate-participant in the Yardfields program, and he escorted her to Knight Farm to meet Joe. On several occasions thereafter plaintiff apparently went by herself to Knight Farm to visit Joe. On the day in question she received a telephone call while at work from a person unknown to her telling her that Joe was sick and had asked that she come to Knight Farm to assist him. She did so after her work day was completed, leaving the restaurant some time after 4 p.m. On her arrival, seeing no one anywhere around, she entered the building where the Yardfields program was conducted. The only person in the building was one Jerome Walker, then unknown to plaintiff, who was also an inmate participant in the Yardfields program. Walker led her to a back room where he *508 said Joe was waiting. Once there, he threatened to sexually assault her, brutally attacked her with a knife, stabbed her repeatedly and finally placed her in the trunk of her car.
Plaintiffs instituted this action against the State and the Department on the theory that the attack was made possible by the negligence of its officers and agents in the operation both of Knight Farm and the Yardfields program. During the pendency of the action plaintiffs sought to amend their complaint to add another basis for their negligence claims. Their attorney had apparently learned, after claiming that that information had been withheld from him by public officials, that there was a cache of weapons, including knives, in the Knight Farm building during the time in question. Apparently juvenile participants in the Yardfields program occasionally showed up at Knight Farm armed, and plaintiffs alleged that when they were disarmed by the noninmate professional staff, the weapons taken from them were placed in a drawer easily accessible to all program participants.
Plaintiffs' motion to amend the complaint and defendants' motion for summary judgment were heard together. Plaintiffs' motion was denied because of their inability, by reason (they claim) of their excusably late acquisition of that knowledge, to causally connect the weapon storage with the attack. Defendants' motion was granted on the ground that the conduct of the Yardfields program was a discretionary activity within the intendment of N.J.S.A. 59:2-3(a), conferring immunity upon the State in respect of all injuries attributable thereto. Plaintiffs appeal both these rulings. We are satisfied that the dismissal of plaintiffs' action was not warranted here in view of the substantial questions raised by this record regarding the applicability of the immunity defense.
The key liability provision of the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq., is N.J.S.A. 59:2-2(a), which imposes upon a public entity liability for the negligence of its *509 employees acting within the scope of their employment. As explained in the Comment on this section
The primary source of public entity liability is contained in ... this section. It establishes the principle of vicarious liability for all public entities for "injury proximately caused by an act or omission of a public employee within the scope of his employment" and thereby relies upon established principles of law such as the doctrine of respondeat superior.

We are, moreover, persuaded that a rational thesis of public employee negligence as a proximate cause of plaintiff's injuries can be predicated on the facts thus far in the record, on those further facts suggested thereby and which might be further developed therefrom, and on the inferences legitimately raised thereby. For example, a jury might reasonably conclude that there was negligence by public employees in making no discernible effort of any kind to keep members of the public off the Knight Farm premises at all, and particularly after program hours, or in permitting the building to be occupied by a single inmate apparently after hours, or in not securing the premises after completion of the day's program, or in leaving one inmate behind instead of assuring the retransport of all to Yardville at the end of the day. It is also clear that a finding of negligence could be predicated on the availability of weapons to inmates at Knight Farm if it were found as a fact that the plaintiff had been stabbed with a knife that was part of the cache aforedescribed. In view of the apparent excusability of plaintiffs' late raising of that allegation and the assumed unlikelihood that the assailant would have been permitted to leave Yardville for the day armed with a knife, we are persuaded, particularly considering the totality of the circumstances here, that plaintiffs should be afforded an opportunity to explore and attempt to establish the source of the weapon used in the attack.
If there is a prima facie case of liability pursuant to N.J.S.A. 59:2-2, as we are satisfied that there may have been here, then plaintiffs would be entitled to proceed with their action unless there is some other section of the Tort Claims Act conferring upon the State a specific and applicable immunity. We have considered the specific immunity provisions here urged by defendants and we are persuaded that as to each of them there is, *510 at this stage of the proceedings at least, a factual question as to their applicability.
We consider first, N.J.S.A. 59:2-3 and 59:3-2, which immunize public entities and their employees from liability for injuries resulting from discretionary activities. Defendants' theory here is that the administrative determinations which had been made in respect of the Yardfields program, including its concept, execution, selection of inmate participants and conduct without custodial supervision, all constitute discretionary activities within the legislative intendment. That may well be so and plaintiffs indeed do not dispute that proposition. But neither is that proposition the end of the matter since plaintiffs do not attribute their injuries to those discretionary aspects of the Yardfields program which relate to its concept, format and internal operation, but rather to simple, ordinary acts of negligence in respect of wholly collateral and peripheral ministerial details.
As the Supreme Court recently held in Costa v. Josey, 83 N.J. 49, 55 (1980), the immunity intended to be conferred by N.J.S.A. 59:2-3(a) "refers to actual, high-level policymaking decisions involving the balancing of competing considerations." Clearly, the Department's design and structure of the Yardfields program represented a basic policy determination which is protected by the immunity rule. But, as Costa further makes clear, once a basic policy determination has been made, execution of the operational details thereof which are not intrinsically implicated by the policy decision itself is subject to ordinary standards of care. In sum, the facts here are supportive of the thesis that the injury was not the result of protected discretionary activity but rather of acts of negligence in respect of such operational details.
The State relies alternatively on the immunity afforded by N.J.S.A. 59:5-2(a), which provides for the immunity of a public entity in respect of "an injury resulting from the parole or *511 release of a prisoner or from the terms and conditions of his parole or release or from the revocation of his parole or release." It is the State's contention that the status of the assailant here was analogous to that of an inmate on work-release. If we were dealing here with a work-release status, we would agree that the immunity afforded by that provision of the act would apply. Indeed, we so held in Burg v. State, 147 N.J. Super. 316 (App.Div.), cert. den. 75 N.J. 11 (1977). The problem here is that it does not appear that a work-release or indeed any release from custody in a functional sense was involved. As we pointed out in Burg, work release denotes the inmate's actual employment in the community at large outside of a custodial facility and hence free from custodial supervision. See N.J.S.A. 30:4-91.3.
The public policy dictating application of the immunity while the inmate is on work-release is obvious and is the same as that motivating immunity when an inmate is on parole or other form of conditional release. Clearly, the interests of sound administration of the correctional policies of this State require that the appropriate officials be free to exercise their discretion as to which inmates may safely be returned to the community and under what conditions. Since the conduct of such inmates while on release cannot be subject to constant supervision or surveillance, imposition of liability on the State for tortious acts committed by inmates on release would prejudice the entire parole and release system. These considerations do not appear to be implicated here. The assailant was not working or otherwise at large in the community. He was engaged in a prison-sponsored program conducted at a correctional facility, albeit a different one from the one in which he was regularly confined. It does not appear, and at the least plaintiffs should have the right to prove, that no aspect of the Yardfields program, including transportation between Yardville and Knight Farm, involved the assailant being at liberty in the sense denoted by a work-release program. And if that in fact is *512 so, then the State's responsibility for that inmate's conduct while he was at Knight Farm should be no different than it would be if the assault had been committed while he was confined at Yardville. In this regard we note that while the Tort Claims Act provides an express immunity where a prisoner is injured by another prisoner, N.J.S.A. 59:5-2(b)(4), it does not provide an immunity where a noninmate is injured by a prisoner. We are satisfied, therefore, that as to injuries inflicted by prisoners upon noninmates, the ordinary negligence rule of N.J.S.A. 59:2-2(a) applies.[1]
Finally, the State argues that it is immune by virtue of N.J.S.A. 59:5-2(b)(4), which provides for an immunity where injury is caused by an escaping or escaped prisoner. We reject this contention at this stage of the case as well. As we have indicated, the record is devoid of adequate facts to support, beyond question, the conclusion that the assailant was an escaped or escaping prisoner. Moreover, as we have also indicated, the factual complex here suggests contributory causes of the injury other than status of the assailant, even if an escaped or escaping status were proved.
Thus, since the availability of no statutory immunity has been proved at the present stage of the case, the dismissal of the action as well as the denial of plaintiffs' motion to amend were improvident. Plaintiffs should be permitted to appropriately amend their complaint and a reasonable additional discovery period afforded all parties to further explore all relevant facts.
The order and judgment appealed from are reversed and the case remanded for further proceedings consistent herewith.
NOTES
[1] We do not address the issue of whether plaintiff would be precluded from recovery if her nonimate status at the time of the injury were found to be that of a trespasser, as the State's pleadings suggest, rather than a visitor or other licensee. That issue is not implicated by the State's immunity defense, and the State is, of course, free to rely on this as well as any other affirmative defense which is supported by the facts as they may be ultimately adduced.