627 A.2d 1090

JOHN W. TICE, SR., ADMINISTRATOR AD PROSEQUENDUM OF JOHN W. TICE, JR., DECEASED, JOHN W. TICE, SR., GENER-AL ADMINISTRATOR OF THE ESTATE OF JOHN W. TICE, JR., DECEASED, AND JOHN W. TICE, SR., AND RITA TICE, INDI-VIDUALLY, PLAINTIFFS–APPELLANTS, v. ROBERT CRAM-ER, CITY OF WILDWOOD POLICE DEPARTMENT, AND CITY. OF WILDWOOD, JOINTLY, INDIVIDUALLY AND IN THE AL-TERNATIVE, DEFENDANTS–RESPONDENTS, AND WILLIAM G. LOGAN, JR., DEFENDANT.

Argued January 4, 1993—Decided July 28, 1993.

O'Hern, J., filed separate concurring opinion.

Clifford, J., filed separate opinion concurring in judgment, in which Handler and Pollock, JJ., joined.

*Anne P. McHugh* argued the cause for appellants (*Pellettieri, Rabstein and Altman,* attorneys).

*James P. Savio* argued the cause for respondents (*Savio, Reynolds & Drake,* attorneys).

*Kenneth I. Nowak* argued the cause for *amicus curiae* New Jersey State Policemen's Benevolent Association (*Zazzali, Zazzali, Fagella & Nowak,* attorneys; *James R. Zazzali,* of counsel).

*Boris Moczula,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney; *Mr. Moczula* and *Debra A. Owens,* Deputy Attorney General, of counsel and on the brief).

The opinion of the Court was delivered by

WILENTZ, C.J.

We face the question whether police officers in pursuit of a vehicle that has failed to heed their command to stop are immune from liability for injuries resulting from the pursuit. The same question was raised in *Roll v. Timberman,* 94 *N.J.Super.* 530, 229 *A.*2d 281 (App.Div.), *certif. denied,* 50 *N.J.* 84, 232 *A.*2d 147 (1967), in a common law context; here the officer's immunity is asserted under the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to :14–4

(the Act). We hold that police officers are absolutely immune under *N.J.S.A.* 59:5–2b(2) for injuries resulting from their pursuit of a person who has failed to stop at police command even though the injuries would not have occurred but for the negligence of the police.

We note the controversy surrounding the matter: the claim that unless there is such immunity, police officers will be reluctant to enforce the law vigorously for fear of liability, and the opposing claim that such pursuits result in a large number of unjustified injuries that can be diminished only by the imposition of liability. That policy question is for the Legislature, which, as we read the law, has answered it in favor of absolute immunity, absent willful misconduct on the part of the police officer.

I

John W. Tice, Sr., acting on behalf of the estate of John W. Tice, Jr., (Tice or plaintiffs) sued defendants City of Wildwood and Robert Cramer, the pursuing officer, and defendant William G. Logan, driver of the fleeing vehicle that ultimately crashed into Tice's pickup truck. Suits were also brought by passengers in the Logan and Tice vehicles and the survivors of one passenger who was killed, as well as by Logan, all of which were settled and are not involved in this appeal. Tice obtained a consent judgment against Logan. We deal only with the claims arising from Tice's death asserted against the City of Wildwood and its police officer Robert Cramer.

The critical facts are largely undisputed. The pursuit started about 8:30 p.m. on November 12, 1985, in the City of Wildwood. Officer Cramer had been dispatched by the police to investigate a melee at a tavern in the City. As he approached the tavern, he noticed a car with its lights out, operated by Logan, with three male occupants pull out of a parking lot across the street from the tavern. Officer Cramer alleged that the car nearly hit his, and that after he started to follow it, a hammer was thrown out of the car in his direction. The pursuit began, and continued through

the streets of Wildwood until the Logan vehicle, having gone through three stop signs, went through a fourth and at that fourth intersection crashed into the Tice vehicle, resulting in Tice's death.

Cramer and the City moved for summary judgment. Based on the materials before the trial court on the motion, a jury could have found that Cramer had no sound reason to believe Logan or his passengers had been involved in the disturbance at the tavern or had thrown any hammer out of the car. It could also have found that initially the Logan vehicle had been traveling at a normal rate of speed; that Cramer had initiated the pursuit; that he had done so despite the fact that the Logan vehicle, with its lights out, traveling on a foggy night, had shown no signs that it would stop as a result of the pursuit; and that he had continued the pursuit nevertheless at very high rates of speed, coming within one or two car lengths of the Logan vehicle, through stop signs, going the wrong way on a one-way street for one block, for a period of almost five minutes until the tragedy occurred. Defendant Cramer's version of the situation is quite different, but for the purpose of the summary judgment motion and this appeal plaintiffs are entitled to the most favorable view of the evidence that a jury might take.

The record indicates that Officer Cramer activated the sirens and flashing lights of the patrol car for the purpose of compelling Logan to stop. Logan admits that he was aware that he was being pursued by police. Logan claims that the only reason he did not stop was that one of his passengers held a tire iron to his throat and threatened to kill him if he did.

Tice's claim against the City is based not only on Cramer's alleged negligence but on the alleged failure of the City to establish adequate pursuit rules to train and instruct its officers about pursuit, the only standard promulgated by the City alleged to be so general as to be meaningless. Tice proffered expert testimony on the need for police training based on the large number of injuries that result from pursuits.

It is clear that a jury could have found the police officer negligent in having failed to terminate the pursuit and in the manner in which it was conducted. The basic premise of such a finding would have been that the officer, obliged to exercise reasonable care for the safety of the public, should have known that the risk of injury involved in the pursuit was not justified by the need to stop or capture Logan. And, under similar common law principles, the City could have been found negligent for failing adequately to train and instruct its officers on the subject of pursuit. Furthermore, in both cases, a jury could have found that but for the officer's negligence, and but for the City's negligence, the accident would not have occurred.

The trial court granted defendants' motion for summary judgment on two bases. First, it ruled that *Roll, supra,* 94 *N.J.Super.* at 536–37, 229 *A.*2d 281, established immunity of police officers under these circumstances and that this common law immunity was incorporated in and continued by the Act. See *N.J.S.A.* 59:3–1b and 2–2b, discussed later. Second, it ruled that *N.J.S.A.* 59:5–2b(2) and :5–2b(3) expressly provided the same immunity. Those sections immunize public entities and public employees for "any injury caused by ... an escaping or escaped person," *N.J.S.A.* 59:5–2b(2), and "a person resisting arrest." *N.J.S.A.* 59:5–2b(3). On appeal, the Appellate Division affirmed, relying on *Roll* and section 5–2b(2), holding further that *N.J.S.A.* 59:3–3 provides an additional basis for immunity. *Tice v. Cramer,* 254 *N.J.Super.* 641, 646, 649, 604 *A.*2d 183 (1992). That latter section of the Act affords a public employee immunity "if he acts in good faith in the execution or enforcement of any law." *N.J.S.A.* 59:3–3.

Before us, plaintiffs renew the same claims of liability: that Officer Cramer is liable under the Act's general liability provision that "[e]xcept as otherwise provided by this act, a public employee is liable for injury caused by his act or omission to the same extent as a private person," *N.J.S.A.* 59:3–1a, and that the City is liable under the cognate section, *N.J.S.A.* 59:2–2a ("A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same

manner and to the same extent as a private individual under like circumstances."). Plaintiffs also claim that the immunities provided by *N.J.S.A.* 59:5–2b(2) ("an escaping or escaped person") and *N.J.S.A.* 59:5–2b(3) ("a person resisting arrest") are inapplicable, and in any event do not protect an employee whose negligence contributed to the injury; and finally they argue that the immunity provided for by *N.J.S.A.* 59:3–3 (the good faith protection) could not be adjudicated as a matter of law on summary judgment motion but required trial by jury.

Plaintiffs further claim that *N.J.S.A.* 39:4–91 imposed a liability on Cramer that "must take precedence over the general immunity provisions of Title 59." That section of the Motor Vehicle laws, in addition to providing that emergency vehicles have the right of way when responding "to an emergency call or in the pursuit of an actual or suspected violator of the law," also provides that "[t]his section shall not relieve the driver of any authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall it protect the driver from the consequences of his reckless disregard for the safety of others." Finally, plaintiffs contend that to the extent that *Roll* was the basis for the Appellate Division's holding that *N.J.S.A.* 59:5–2b(2) immunized Officer Cramer (it did not rule on *N.J.S.A.* 59:5–2b(3)), it had been misread by the Appellate Division—it provided no immunity at all, it simply dispelled any notion that a police officer was the insurer of the conduct of a fleeing culprit regardless of the officer's negligence.

Defendants continue to maintain that *N.J.S.A.* 59:5–2b(2) absolutely immunizes both the police officer pursuing the fleeing vehicle and the public entity, the City. They claim that that section, expressly applicable to both the public entity and the public employee, immunizes the City not only for any *respondeat superior* liability but for liability on any theory, including a theory that asserts independent negligence apart from *respondeat superior*. They continue to assert that in addition to this explicit statutory provision, the common law ruling in *Roll* was adopted by the Act, providing a further basis for immunity. They also rely on

N.J.S.A. 59:3–3 (the good faith law enforcement defense) as interpreted and applied by the Appellate Division.

*Amicus* Policemen's Benevolent Association (PBA) suggests a new defense not raised by any of the parties: that defendants are immunized by the discretionary immunity provided by the ·Act (*N.J.S.A.* 59:3–2 and :2–3). *But see Bethlehem Township Bd. of Educ. v. Bethlehem Township Educ. Ass'n,* 91 *N.J.* 38, 48–49, 449 A.2d 1254 (1982) (*amicus curiae* must accept case before court as presented by parties and cannot raise issues not raised by parties).

## II

We briefly review some of the general principles of the Act and their application to cases of this kind. Public entities are not liable for an injury, except as such liability may be provided for in the Act. *N.J.S.A.* 59:2–1; *Chatman v. Hall,* 128 *N.J.* 394, 402, 608 A.2d 263 (1992); *see Bombace v. City of Newark,* 125 *N.J.* 361, 372, 593 A.2d 335 (1991) (noting Act is intended "to reestablish a system in which immunity is the rule, and liability the exception"). The primary liability imposed on public entities is that of *respondeat ˙superior:* when the public employee is liable for acts within the scope of that employee's employment, so too is the entity; conversely, when the public employee is not liable, neither is the entity. *N.J.S.A.* 59:2–2. Public employees are liable under the Act in the same manner as private individuals, *N.J.S.A.* 59:3–1a, unless there is an immunity "provided by law" (including the Act); and the public employee's liability is "subject to any defenses that would be available" were he a private person. *N.J.S.A.* 59:3–1b. The liability of the public entity must be found in the Act, and where found, is subject to any immunity found in the Act and further subject to any immunity previously established by common law. *Manna v. State,* 129 *N.J.* 341, 347, 609 A.2d 757 (1992); *Pico v. State,* 116 *N.J.* 55, 62–63, 560 A.2d 1193 (1989); *Rochinsky v. State Dep't of Transp.,* 110 *N.J.* 399, 408–09, 541 A.2d 1029 (1988). Liability of the public employee, however,

may be found either in the Act or at common law but it too is subject to the immunities of the Act and the common law. *Chatman, supra,* 128 *N.J.* at 404, 608 *A.*2d 263. When both liability and immunity appear to exist, the latter trumps the former.

Those are the shorthand rules subject to potential variations, permutations, and combinations not yet fully developed by our cases. *Rochinsky, supra,* 110 *N.J.* at 408, 541 *A.*2d 1029; *Costa v. Josey,* 83 *N.J.* 49, 61, 415 *A.*2d 337 (1980) (Clifford, J., dissenting); see also *Chatman, supra,* 128 *N.J.* at 402, 608 *A.*2d 263 (noting distinction between public-employee and public-entity liability analysis).

The subtleties that have divided this Court in some of those cases are not present here. They relate mainly to the precise scope of liabilities and immunities provided to employees at common law and to the Court's power further to develop the common law in this respect by clarifying, expanding, or restricting those liabilities and immunities and the immunities provided to public entities at common law. They relate also to the extent of flexibility the Legislature intended to vest in this Court in its interpretation of the Act. *Chatman, supra,* 128 *N.J.* at 404–05, 608 *A.*2d 263; *Rochinsky, supra,* 110 *N.J.* at 408, 541 *A.*2d 1029. They can relate also to the question whether an immunity conferred by common law and a liability conferred by the Act are actually in conflict. *See Rochinsky, supra,* 110 *N.J.* at 416–17, 541 *A.*2d 1029 (holding common law snow-removal immunity not in conflict with Act's duty to warn).

We do not have to grapple with these questions, including whether *Roll* conferred a common law immunity preserved by the Act, because we find that section 5–2b(2) confers absolute immunity, except where the police officer engages in willful misconduct.

### III

The three bases for immunity urged by defendants are the common law immunity of *Roll,* said to be incorporated in the Act by virtue of sections 2–1b and 3–1b, and the express immunities

provided by sections 5–2b(2) and 3–3. *Amicus* PBA would have us also consider the discretionary immunity given to employees by *N.J.S.A.* 59:3–2a.

Insofar as immunity under *Roll* is concerned, we treat the issue since it was dealt with at length by the trial court and the Appellate Division and is the subject of conflicting Appellate Division decisions. Ultimately, it is irrelevant, for we find the statutory immunities applicable (and one of them, section 5–2b(2), dispositive here), their applicability and effect being independent of *Roll.*

*Roll* was a standard police pursuit case, a third party injured by the pursued vehicle. While the Appellate Division's discussion in that matter is phrased in terms of "proximate cause" and the absence of "*actionable* negligence," 94 *N.J.Super.* at 538, 229 *A.*2d 281 (emphasis supplied), we agree with the Appellate Division below that the essence of *Roll*'s holding was that, as a matter of law, negligent pursuit by a police officer, even if factually a concurring cause (along with the negligence of the pursued vehicle) of the injury, cannot result in liability. Despite evidence of negligence on the part of the officer, the matter is not to be submitted to a jury: there is no liability as a matter of law. We agree with the Appellate Division that such a holding is the functional equivalent of a grant of immunity to police officers under these circumstances.

Our conclusion is based on the language of *Roll.* There, the Appellate Division stated as a general proposition that "[t]he decisive issue in this case is whether a police officer is liable for damage caused by a vehicle operated by a fleeing law violator who is being pursued by the officer in the performance of his duty," 94 *N.J.Super.* at 536, 229 *A.*2d 281, citing cases supporting "the majority view" that "the police officer is not liable." *Ibid.* Thereafter, the *Roll* court notes the contrary opinion of what it characterizes as "the minority view," namely, that "liability of pursuing police officers is a jury question," and its "accord with the majority view." *Id.* at 537, 229 *A.*2d 281. The result is a general

holding, not dependent on the conduct of the officer in that case, that such liability is *not* a jury question.

Obviously, other statements by that court make our conclusion less than certain. See, *e.g., id.* at 538, 229 *A.*2d 281 ("We have carefully reviewed the record. We find no evidence of *actionable* negligence on the part of Officer Martin. His pursuit of Timberman was not the legal or proximate cause of the accident." (emphasis supplied)). As the Appellate Division in this matter observed, *"Roll* is not a model of clarity." 254 *N.J.Super.* at 648, 604 *A.*2d 183.

The cases cited in *Roll, supra,* 94 *N.J.Super.* at 536–37, 229 *A.*2d 281, in support of its holding are likewise ambiguous. However, these cases do reflect *Roll* 's theme: that as a matter of law a police officer is not liable in such a pursuit situation, that the issue does not even go to the jury. All of those said to be in the minority do not find such immunity and conclude that the matter of negligence should be submitted to the jury. We read the "proximate cause" language to mean only that the police officer's conduct *never* will be the "proximate cause" under these circumstances.

We therefore agree with the Appellate Division's decision in *Blanchard v. Town of Kearny,* 153 *N.J.Super.* 158, 379 *A.*2d 288 (1977), *affirming on the trial court's opinion,* 145 *N.J.Super.* 246, 367 *A.*2d 464 (Law Div.1976), that *Roll* immunizes the police officer at common law, and that such immunity continues under the general provision found in section 3–1b (subjecting liabilities of public employees to "any immunity of a public employee provided by law," including, as noted in the comment to the related provision concerning public entities, section 2–1b, "any immunity provisions provided in the act or by common law," Gann, *N.J. Statutes Title 59,* 1972 Task Force, comment on *N.J.S.A.* 59:2–1b). We disagree with the contrary conclusion in *Smith v. Nieves,* 197 *N.J.Super.* 609, 485 *A.*2d 1066 (App.Div.1984), and *Wood v. City of Linden,* 218 *N.J.Super.* 11, 526 *A.*2d 1093 (App.Div.1987), cases that take the other view of *Roll,* namely, that it simply represents

a fact situation where there was no evidence of negligence whatsoever.

We note that this common law immunity was declared despite the urging of the plaintiffs in *Roll* that the Legislature through *N.J.S.A.* 39:4–91 had explicitly imposed a duty on pursuing police officers to act with due care and a consequent liability when their reckless disregard for the safety of others in such pursuit led to injury. The court in *Roll* simply noted that that statute "has no application in the present case. We are not here concerned with an issue involving the right of way of a police vehicle." 94 *N.J.Super.* at 535, 229 *A.*2d 281. (See also the conclusion of the Appellate Division in this case that the section, adopted in 1928, "has nothing to do with the immunity scheme contemplated by the 1972 Tort Claims Act." 254 *N.J.Super.* at 651, 604 *A.*2d 183.) The treatment of that statute by *Roll* is of some importance here since it is again urged as a basis for police officer liability. Were there nothing else supporting immunity of a police officer in this situation, we would conclude that the common law rule that we find embedded in *Roll* is consistent with the Act, is incorporated in the Act, and overcomes the argument arising from *N.J.S.A.* 39:4–91.

The primary sources of immunity relied on by defendants are *N.J.S.A.* 59:5–2b(2) and *N.J.S.A.* 59:3–3. They provide as follows:

Neither a public entity nor a public employee is liable for:

\* \* \* \* \* \* \* \*

a. an injury resulting from the parole or release of a prisoner or from the terms and conditions of his parole or release or from the revocation of his parole or release.

b. any injury caused by:
(1) an escaping or escaped prisoner;
(2) an escaping or escaped person; or
(3) a person resisting arrest; or
(4) a prisoner to any other prisoner.

[*N.J.S.A.* 59:5–2.]

A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment.

[*N.J.S.A.* 59:3–3.]

Neither of these statutes was cited or considered in *Blanchard* or *Smith.* *Wood* considered only the "good faith" immunity of *N.J.S.A.* 59:3–3.

■ We deal first with section 5–2b(2)—an injury caused by "an escaping or escaped person." Plaintiffs claim the immunity is simply not applicable to this situation. They note that Logan was never arrested; indeed, given whatever offense the Officer observed, it is alleged that Logan was not even subject to arrest. Noting the implications of the title given to this section in the statutory compilation ("Parole or escape of prisoner; injuries between prisoners"), and disregarding its exclusion as an indicator of legislative intent, see *N.J.S.A.* 1:1–6; *State v. Blinsinger,* 114 *N.J.Super.* 318, 322, 276 *A.*2d 182 (App.Div.1971), plaintiffs examine each part of the section to demonstrate its inapplicability. They cite statutes that existed in 1972, the year of the adoption of the Act, that define the various offenses surrounding "escape." Plaintiffs contrast the definition of "eluding an officer," *N.J.S.A.* 2A:170–25.8, with the definitions for "escaping prisoners," *N.J.S.A.* 2A:104–6, and "resisting arrest," *N.J.S.A.* 2A:99–1 (plaintiffs' citation to this section is obviously wrong—it has little to do with "resisting arrest," a common law crime that was then uncodified). They note that Logan *was* "eluding an officer" as that offense was then defined (this definition remains unchanged, see *N.J.S.A.* 2C:29–2b), and was not an "escaping prisoner" nor "resisting arrest." Plaintiffs conclude that the Legislature chose not to immunize the only situation involved here, where the offense was that of "eluding an officer."

■ We disagree with plaintiffs' implied premise that the Legislature sought to define public employee immunity in this section by reference to the definition of then-existing offenses. These preexisting offenses are nowhere mentioned in the legislative history of the Act or in the Comments. The possible distinctions between an escaping prisoner, an escaping person, or simply a person eluding an officer do not bear a sufficient relationship to

the purposes of the immunity to warrant attributing such an intent to the Legislature when none is even hinted. To the extent that the section is viewed in the context of police pursuit, the anomaly of such distinctions becomes apparent.

The Legislature presumably wanted to provide very specific immunity to police officers in the pursuit of wrongdoers who were escaping or who had escaped (no argument being made by plaintiffs that the section, if applicable at all, applied only to immunize negligent acts that permitted the escape). It seems most unlikely that the Legislature would want to base that immunity on the technical status of suspects as persons who had just been arrested, or who were about to be arrested, or for whom good cause for arrest existed. The most likely legislative intention evinced by the statutory language in the context of police pursuit is that when the officer suspected someone of having violated the law and was pursuing him, the officer's conduct was immune from liability. And when plaintiffs' argument extends to "a person resisting arrest," *N.J.S.A.* 59:5–2b(3), the technicalities multiply. Those complexities include, as noted by the Appellate Division, the distinction between one who is almost handcuffed and one engaged in "flight knowingly intended to prevent a police officer from effecting an arrest," the common law crime of "resisting arrest." 254 *N.J.Super.* at 648 n. 1, 604 *A.*2d 183. We agree completely with the Appellate Division on this aspect of the matter (referring to definitions in the Code of Criminal Justice similar to those found in the statutes cited above):

We are not persuaded that these definitions in the Criminal Code must control our construction of Chapter 5 of Title 59, earlier legislation specifically designed to provide immunity to public entities and employees who grapple and tangle with the daily problems of law enforcement. We do not think that the words "escaped or escaping person" in *N.J.S.A.* 59:5–2(b)(2) should received a cramped interpretation in view of the clear legislative objective of immunity.

[*Id.* at 650, 604 *A.*2d 183.]

The history of the California statute, from which ours was patterned, is instructive. It is by now well-settled that that history is particularly significant to our interpretation of the Act,

*Rochinsky, supra,* 110 *N.J.* at 407, 541 *A.2d* 1029, as are the interpretations of the California statute by its judiciary, both before and after our Legislature's enactment of the Tort Claims Act. *Fuchilla v. Layman,* 109 *N.J.* 319, 331, 537 *A.2d* 652 (1988), *cert. denied sub nom. University of Dentistry & Medicine v. Fuchilla,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.2d* 51 (1988). At the time of the adoption of the Act, the related California provision afforded immunity for any injury caused by "an escaping or escaped prisoner" and by "an escaping or escaped *arrested* person." *Cal. Gov't Code* § 845.8(b) (emphasis added). The deletion of the word "arrested" from the Act as adopted by our Legislature reenforces the conclusion not only that the "person" referred to need not have been arrested, but that the Legislature's intention was to give the immunity provided for in the section a broad sweep. The fair meaning of the words suggests a situation in which *any* person is trying to avoid apprehension by a police officer. Such a construction is supported by *Kisbey v. California,* 36 *Cal.3d* 415, 204 *Cal.Rptr.* 428, 682 *P.2d* 1093 (1984), in which the California Supreme Court said, even about the more restrictive California provision:

> It seems clear that the purpose of the broadening amendment ... was to immunize public entities and employees from the entire spectrum of potential injuries caused by persons actually or about to be deprived of their freedom who take physical measures of one kind or another to avoid the constraint or to escape from it. It would plainly violate the legislative intent if particular words of the statute—such as "arrest" or resisting"—were given such technical meanings that a case fell between the cracks of the immunity because, for example, the police had not intended a full arrest—as distinguished from a temporary detention—when the subject fled, or because at the time of the escape the process had not reached the point of physical control over the suspect.

[*Id.* 204 *Cal.Rptr.* at 431, 682 *P.2d* at 1096.]

Without attempting to ascertain the limits of this construction, certainly this section of the Act applies where a disturbance warranting police attention has occurred, the person fleeing is a suspect, and flight is attempted by a vehicle at night with the lights turned out.

■ One of the clear purposes of this section of the Act is to encourage vigorous law enforcement. In particular, it is intended to encourage police officers to pursue suspects, to do so effectively, and to accomplish that by relieving them of any concern that their actions in enforcing the law in this respect will result in liability either to them or to government. Although one might find better ways to say it, "escaping person" fairly describes someone who is fleeing from a police pursuit by vehicle. That may not be the "plain meaning" of the section, but given its history, its apparent purpose, and the absence of any indication of a contrary intent, we conclude that the statute should be so construed.

The effect of the section 5-2b(2) immunity would seem to be clear. The immunity relieves the officer (and the public entity— the immunity applies to both) of whatever liability would otherwise attach for the officer's negligent conduct in connection with the pursuit. If that is not its effect, then there is no point whatsoever to the immunity. Put differently, if there is a pursuit, and the escaping person causes an injury, yet in connection with the pursuit there is no negligence whatsoever on the part of the officer, no immunity is needed: neither the common law nor any other law imposes liability on an officer simply because he or she was pursuing someone, liability regardless of the lack of negligence of the officer. No case, text, or statute has ever suggested, for instance, that the pursued somehow becomes the agent of the officer or that the effects that the officer causes—even if the officer is totally non-negligent—result in liability. On the other hand, if the officer *is* negligent and his or her negligence, combined with that of the fleeing suspect, results in the injury but the subsection is construed not to relieve the officer of liability, the effect is again the same as if the section did not exist.

We are therefore somewhat befuddled by those cases that suggest that defendants to whom section 5-2b applies are immune unless they are guilty of some act of negligence. For instance, in *Flodmand v. State*, 175 *N.J.Super.* 503, 420 *A.*2d 365 (App.Div. 1980), the plaintiff was assaulted by someone alleged to be an

escaping or escaped prisoner, under *N.J.S.A.* 59:5–2b(1) (a typographical error refers to it as section 5–2b(4)). *Id.* at 512, 420 A.2d 365. The Appellate Division, assuming for the purpose of argument that an escaping or escaped prisoner was involved, notes that the State institution could nevertheless be liable, despite section 5–2b(1) immunity, if the entity was guilty, as well it might have been, of some act of negligence that made the injury by the "prisoner" possible. In other words, the concurring negligent cause was thought to defeat the immunity expressed by the section—which expressly immunizes not only the public employee but the public entity as well. *Ibid.* While entity liability was there involved, we suggest again that the immunity of the section is severely weakened by such a ruling. If the liability of the entity were to be based solely on the immunized negligence of some public employee, the entity would be protected by section 2–2b, excluding public entity liability when the public employee is not liable—the obvious opposite of *respondeat superior.* The entity would have no need for the separate immunity expressly given to it in section 5–2. The inclusion of public entity immunity, therefore, in section 5–2b(1), the section involved in *Flodmand,* if it is to have any impact at all, must be to immunize the public entity precisely against this kind of "independent" negligence.

The view we take of the effect of section 5–2b immunity, when applicable, corresponds more with that taken by the court in *Burg v. State,* 147 *N.J.Super.* 316, 371 *A.*2d 308 (App.Div.), *certif. denied* 75 *N.J.* 11, 379 *A.*2d 242 (1977). There the Appellate Division held that the immunities provided by sections 5–2a and 5–2b(1) absolutely immunized both the public entity and the public employee from negligence, whether discretionary or ministerial, whether acts of omission or commission. *See also White v. Lewis,* 156 *N.J.Super.* 198, 201, 383 *A.*2d 744 (App.Div.1978) (finding absolute immunity under section 5–2b(4)). The Appellate Division was guided by the California decisions making " 'the immunity with respect to injury caused by an escaped prisoner an absolute one.' " 147 *N.J.Super.* at 324, 371 *A.*2d 308 (quoting *County of Sacramento v. Superior Court,* 8 *Cal.*3d 479, 105 Cal.Rptr. 374, 379, 503 *P.*2d

1382, 1387 (1972)). The decision indicates not only that those acts of negligence, both discretionary and ministerial, related either to the release of an inmate on parole or to his escape or escaping as a prisoner, were immunized, but also that those decisions of the public entity, even if not immunized by the general sections conferring entity immunity (sections 2–2 and 2–3), would also be immunized under the specific provisions of sections 5–2a and 5–2b(1). *Id.* 147 *N.J.Super.* at 324–25, 371 *A.*2d 308. Just as the Appellate Division in *Burg* construed section 5–2a to confer immunity for *all* acts within the ambit of release procedures, so its language indicated it would immunize *all* acts of a public entity or a public employee in connection with section 5–2b—there, "an escaping or escaped prisoner." *Id.* at 325, 371 *A.*2d 308.

■ The policy considerations that form the basis for the immunity of section 5–2b, be it an escaping or escaped prisoner or person, support this construction immunizing both the employee and the entity for *all* acts of negligence related to the injuries caused by the escape, whether those of the employee or the entity, and whether independent or not. Those policy considerations are obvious here when analyzing the public employee's liability: the justification is the encouragement of the police officer diligently and aggressively to enforce the law, thought to be diminished by the specter of tort liability. Not so clear, but equally applicable, is the policy consideration involved when the potential liability is that of the public entity for its "independent" negligence in failing to impose standards regarding pursuit, or in failing to train police officers in the execution of those standards. Obviously, such standards and training could result in greater care on the part of police officers and in fewer injuries. But, equally obviously, the potential of tort liability might encourage standards and training so restrictive—for the purpose of avoiding injuries and liability—as to impede the ultimate goal of vigorous law enforcement, including the vigorous pursuit of suspects. It is true there might be much greater care, even better care, but it is also true that there might be less vigorous enforcement. The Legislature has made its choice, and we are bound by it. The State, however,

believes reasonable care can be achieved, despite immunity, through the imposition of detailed pursuit standards.

The argument that, despite section 5–2b, the entity and the employee are liable for their concurrent acts of negligence leading to the injury, amounts to a contention that the statute does not literally apply, its scope being limited to injuries "caused by an escaping or escaped prisoner" or "caused by an escaping or escaped person," and not those caused by both that person and the police officer. That contention would have us read the statute as if it said "caused *solely* by an escaping or escaped prisoner" or "caused *solely* by an escaping or escaped person." The Legislature knew how to achieve that result when it wanted to (see *N.J.S.A.* 59:4–7 (no liability for an injury "caused *solely* by the effect on the use of streets and highways of weather conditions") (emphasis added)), and it chose not to do so here. It is an anomaly of sorts in connection with the weather immunity, and it would be an anomaly if used here for the same reason (for if such causes are the sole cause, there is nothing to render immune, see *Pico, supra,* 116 *N.J.* at 64, 560 *A.*2d 1193, (Clifford, J., dissenting).

 Concerning the PBA's contention that the discretionary immunity provided to employees by section 3–2a applies, we note first our decision in *Costa, supra,* 83 *N.J.* at 54–55, 415 *A.*2d 337, limiting such immunity to discretion exercised at the highest levels of government in matters of policy or planning. Although that decision related to public entities, the parallel language requires the conclusion that it is similarly restricted when applied to public employees. Quite clearly, neither the alleged negligence of the public entity nor that of the police officer rose to that level. The former was presumably an operational decision not to train or train well (and indeed there is no evidence of any such "decision," an essential element to that kind of immunity). See *Smith, supra,* 197 *N.J.Super.* at 614–15, 485 *A.*2d 1066 (noting that police training is "operational" decision not immunized under section 2–3(a)). We disagree with *Smith*'s conclusion that failure to train

can result in liability to the entity; such liability is precluded by section 5–2b(2), not because it immunizes the officer but because it directly immunizes the entity as well. See *Flodmand, supra,* 175 *N.J.Super.* at 510, 420 *A.*2d 365 (finding operational implementation of prison release program not immunized under section 2–3(a)). The officer's conduct, comprised of the decision whether to pursue, how to pursue, and whether to continue to pursue, is also infinitely distant from high-level policy or planning decisions. As noted in argument before us, to label this kind of determination by a public employee "discretionary," and therefore immune, would end all public employee liability, or practically all, for hardly any acts or omissions are not subject to some judgment or discretion. *See Costa, supra,* 83 *N.J.* at 60, 415 *A.*2d 337.

The immunities provided for by section 5–2b appear to be absolute except in the event of willful misconduct on the part of a public employee (see *N.J.S.A.* 59:3–14a), certainly absolute in this case. Our sense of the intent of the section is that it immunizes absolutely all negligence of the public entity or the public employee that when combined with the conduct of an escaping or escaped prisoner or person leads to an injury. It makes no difference whether the negligence is discretionary or ministerial, whether an act or omission, whether it precedes the escape or follows it, whether it triggers the escape or affects it, it is immune. In that respect we read section 5–2b as no different from section 5–2a, despite the difference in language, so that neither a public entity nor a public employee is liable for an injury resulting from the escape or from the escaping of a prisoner or person. It therefore is clear, just as it is in the case of parole or release under section 5–2a, that all of the actions of government and its employees related to that escape or escaping are immune, and that no one can argue that the immunity applies only to injuries caused solely by the act of the escaping or escaped prisoner or person—for which no immunity at all is needed.

Some of our cases have noted and either accepted or rejected the potential relevancy of our Motor Vehicle statutes,

particularly *N.J.S.A.* 39:4–103 (exempting officers from speed limits when engaged in pursuit), and *N.J.S.A.* 39:4–91 (giving pursuing officers and others the "right of way" while engaged in pursuit but requiring them nevertheless to exercise due care, and arguably imposing liability for injuries caused by "reckless disregard for the safety of others").[1] See, *e.g., Roll, supra,* 94 *N.J.Super.* at 535–36, 229 *A.2d* 281 (relying on *N.J.S.A.* 39:4–103 to support officer's right to speed, but rejecting *N.J.S.A.* 39:4–91 as irrelevant to officer's liability); *Fielder v. Jenkins,* 263 *N.J.Super.* 231, 235–36, 622 *A.2d* 906 (App.Div.1993) (citing *N.J.S.A.* 39:4–91 standard of care in holding that pursuing police may be held liable for injuries caused directly by their negligence). The Appellate Division, as noted above, rejected the contention that *N.J.S.A.* 39:4–91 "erod[ed] immunity from tort liability under" the Act, noting its origin in 1928, with the observation that it "has nothing to do with the immunity scheme contemplated by the 1972 Tort Claims Act." 254 *N.J.Super.* at 650–51, 604 *A.2d* 183; *see also Varlaro v. Schultz,* 82 *N.J.Super.* 142, 148–49, 197 *A.2d* 16 (App.

---

[1] *N.J.S.A.* 39:4–103 provides:

 Motor vehicles belonging to the military establishment, while in use for official purposes in time of riot, insurrection or invasion; all police officers, while the officers are engaged in the apprehension of violators of the law, or of persons charged with, or suspected of, a violation, are exempt from the provisions of this chapter relating to speed.

*N.J.S.A.* 39:4–91 provides:

 The driver of a vehicle upon a highway shall yield the right of way to any authorized emergency vehicle when it is operated on official business, or in the exercise of the driver's profession or calling, in response to an emergency call or in the pursuit of an actual or suspected violator of the law and when an audible signal by bell, siren, exhaust whistle or other means is sounded from the authorized emergency vehicle and when the authorized emergency vehicle, except a police vehicle, is equipped with at least one lighted lamp displaying a red light visible under normal atmospheric conditions from a distance of at least five hundred feet to the front of the vehicle.

 This section shall not relieve the driver of any authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall it protect the driver from the consequences of his reckless disregard for the safety of others.

Div.1964) (implying, in pre-Act case, that violation of *N.J.S.A.* 39:4–91 may constitute evidence of officer's negligence).

Whatever the relevance of those Motor Vehicle statutory provisions, we hold that they do not affect the immunity conferred on police officers by the Act, specifically by section 5–2b(2), as we have construed it. Such pre-Act liability, if it existed, arising out of preexisting statutes is inconsistent with the absolute immunity of section 5–2b(2) and, to that extent, is repealed by that section. See *N.J.S.A.* 59:12–2 (repealing "all acts and parts of acts inconsistent" with the Act). We recognize that the liabilities of public employees, even under the Act, were not "frozen" as they existed in 1972, and that this Court, through its traditional common law function in developing decisional law, as well as through the limited power given it by the Act for flexible decision-making in construing the Act, may expand those public employee liabilities. See *Chatman, supra,* 128 *N.J.* at 404–05, 608 *A.*2d 263. Under no circumstances, however, may those liabilities, whatever their origin, trump the immunities provided for in the Act. Where inconsistent, the liabilities fall, the immunities stand. *Bombace, supra,* 125 *N.J.* at 372, 593 *A.*2d 335.

We note that the somewhat different result in California is clearly distinguishable from that which we reach and not at all persuasive of any different result here. Unlike the New Jersey Act, the California Tort Claims Act qualifies the general immunities afforded a public entity and a public employee by giving the immunities effect "[e]xcept as otherwise provided *by statute.*" *Cal. Gov't Code* § 815.2(b) and § 825.2(b) (emphasis added). Thus, while the California act is that State's principal source of the immunity and liability of public entities and public employees, other statutory sources of liability may trump the immunity provided for in that act. *Duarte v. City of San Jose,* 100 *Cal. App.*3d 648, 161 *Cal.Rptr.* 140, 142 (1980); *see* Van Alstyne, *California Government Tort Liability* § 5.7 (1964 and 1969 Supp.). With the New Jersey Act, the Legislature chose to qualify the same general immunity for public entities only to the extent as "otherwise provided *by this act,*" *N.J.S.A.* 59:2–1a

(emphasis added), and also chose to impose on a public employee the same type of liability as a private person *"[e]xcept as otherwise provided by this act."* *N.J.S.A.* 59:3–1a (emphasis added). In so doing, the Legislature clearly intended that our Tort Claims Act would be the exclusive statutory source of liabilities for public entities and that the immunities provided to public employees would not be negated by liabilities imposed outside the Act. This critical difference between the California and the New Jersey acts may explain the different approach taken by the California lower courts in police motor vehicle chase cases. A significant body of California case law has reconciled in favor of plaintiffs the provision of the Vehicle Code imposing public entity liability for injuries caused by a public employee's negligent operation of a motor vehicle with the conflicting provision of that state's Tort Claims Act providing public entity and public employee immunity for injuries caused by "an escaping or escaped arrested person" or "a person resisting arrest." *E.g., Stark v. City of Los Angeles,* 168 *Cal.App.*3d 276, 214 *Cal.Rptr.* 216 (1985); *City of San Jose v. Superior Court,* 166 *Cal.App.*3d 695, 212 *Cal.Rptr.* 661 (1985); *Duarte, supra,* 161 *Cal.Rptr.* 140. Some cases have imposed liability on public entities (but not public employees) in hot pursuit cases under the Vehicle Code on the rationale that the later-enacted California Tort Claims Act itself allows it. *E.g., Brummett v. County of Sacramento,* 21 *Cal.*3d 880, 148 *Cal.Rptr.* 361, 363, 582 *P.*2d 952, 954 (1978). Lower courts have imposed liability against the public entity after finding that the public policy underlying the "escaping or escaped arrested person" immunity provision is not offended by the absolute public entity liability provision of the Vehicle Code. *E.g., Duarte, supra,* 161 *Cal.Rptr.* at 144. In New Jersey either approach would offend the clear legislative policy to establish immunity as the general and superseding rule. See *Rochinsky, supra,* 110 *N.J.* at 407–08, 541 *A.*2d 1029.

Because the immunity provided in *N.J.S.A.* 59:5–2b is absolute, absent an officer's willful misconduct, conflicting provisions of our Motor Vehicle statutes cannot be given effect. The rule otherwise

would be to ignore what is probably the clearest and most important command of the Act, namely, that the immunities set forth in the Act prevail over any liabilities, whether found in the Act or in preexisting law, including statutes. See *N.J.S.A.* 59:2–1b; *N.J.S.A.* 59:3–1b, and comments thereto. *See also Abei v. Monmouth County*, 148 *N.J.Super.* 430, 434, 372 *A.*2d 1130 (App. Div.1977) (applying section 12–2, noted above, which provides for partial repeal of inconsistent acts). *Fielder, supra,* 263 *N.J.Super.* 231, 622 *A.*2d 906, is not inconsistent since its imposition of Motor Vehicle act liability is premised on its holding that the Act's immunity did not apply. The denial of immunity in *Fielder* was based on the fact that the officer's car, rather than the car of the pursued party, struck the plaintiff's car. The distinction justified by the Appellate Division on the basis of the statutory language seems unrelated to the need for police immunity, a distinction based on a circumstance dependent totally on chance—the chance that the innocent vehicle will get to the intersection when the pursuing police car is crossing it rather than when the suspect's car is. We express no view, however, on that issue of statutory interpretation.

We note pending legislation on this matter (A–2242) that apparently would apply the immunity to such a situation, subject, however, to a showing that the officer complied with the Attorney General's guidelines or policy concerning Motor Vehicle pursuits. Since the proposed bill explicitly preserves existing immunities provided by the Act, it seems there may be some question whether its conditional immunity would affect a construction of the section affording immunity that is absolute.

We question *Fielder*'s conclusion that section 3–3 (good faith immunity in enforcing the law) does not apply to a high speed chase—a chase described in *Fielder* as "negligent operation by a police officer of his patrol car." *Id.* at 236, 622 *A.*2d 906. That conclusion does not accord with our understanding of that section (nor with the Appellate Division's construction in this case). In any event, it is not asserted by the plaintiff here.

We have reviewed recent cases elsewhere and discern none that is helpful in resolving this matter, other than those mentioned from California. Some are based on Tort Claims statutes substantially different from ours. *E.g., Fries v. Fincher,* 610 *N.E.*2d 291 (Ind.Ct.App.1993); *Boyer v. State,* 323 *Md.* 558, 594 *A.*2d 121, 131 (1991); *Travis v. City of Mesquite,* 830 *S.W.*2d 94, 99 (Tex.1992); *Mason v. Bitton,* 85 *Wash.*2d 321, 534 *P.*2d 1360, 1364–65 (1975); *DeWald v. State,* 719 *P.*2d 643 (Wyo.1986). The Indiana Court of Appeals, for example, recently recognized, under a substantially different provision of the Indiana Tort Claims Act, immunity for police officers and their governmental employers for third-party injuries resulting from high speed police chases of fleeing suspects. *Fries, supra,* 610 *N.E.*2d at 293. A few jurisdictions recognize a limited immunity in high speed police pursuits when an officer is not grossly negligent or not engaged in wanton or extreme conduct, *e.g., Bullins v. Schmidt,* 322 N.C. 580, 369 *S.E.*2d 601, 603 (1988); *Jones v. Ahlberg,* 489 *N.W.*2d 576, 581 (N.D.1992), and some courts have found no police liability for third-party injuries in hot pursuit cases, because of such statutory criteria. See, *e.g., Tomcsik v. United States,* 720 *F.Supp.* 588, 592 (E.D.Mich.1989) (applying Michigan law), *aff'd,* 917 *F.*2d 564 (6th Cir.1990), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 1417, 113 *L.Ed.*2d 470 (1991); *Chambers v. Ideal Pure Milk Co.,* 245 *S.W.*2d 589 (Ky.1952); *Boyer, supra,* 594 *A.*2d 121; *Oberkramer v. City of Ellisville,* 706 *S.W.*2d 440, 452 (Mo.1986); *Lee v. City of Omaha,* 209 *Neb.* 345, 307 *N.W.*2d 800 (1981); *Peak v. Ratliff,* 185 *W.Va.* 548, 408 *S.E.*2d 300 (1991). The majority of recent cases, however, hold that a police officer or a governmental employer may be held liable for third-party injuries when the police officer is negligent in continuing a vehicular chase. See, *e.g., Schatz v. Cutler,* 395 *F.Supp.* 271 (D.Vt.1975) (applying Vermont law); *Estate of Aten v. City of Tuscon,* 169 *Ariz.* 147, 151, 817 *P.*2d 951, 955 (App.1991); *Tetro v. Town of Stratford,* 189 *Conn.* 601, 458 *A.*2d 5, 10 (1983); *Pinellas Park v. Brown,* 604 *So.*2d 1222, 1227 (Fla.1992) (plurality opinion); *Nelson v. Department of Public Safety,* 581 *So.*2d 344 (La.Ct.App.1975), *writ denied,* 586 *So.*2d 561

(La.1991); *Fiser v. City of Ann Arbor,* 417 *Mich.* 461, 339 *N.W.*2d 413 (1983); *Dickens v. Horner,* 531 Pa. 127, 611 *A.*2d 693 (1992); *Travis, supra,* 830 *S.W.*2d 94; *Mason, supra,* 534 *P.*2d at 1363. While these cases do not provide any guide for our legal analysis, they seem to indicate a growing policy that refuses to accord absolute immunity.

We note that a few courts do recognize, on common law grounds, an absolute immunity for police officers whose vehicular pursuits of suspects result in injuries to innocent third-parties. See *Thornton v. Shore,* 233 *Kan.* 737, 666 *P.*2d 655, 668 (1983) (articulating Kansas public policy in encouraging law enforcement officers to remove drunken drivers from Kansas roads); *Pletan v. Gaines,* 494 *N.W.*2d 38 (Minn.1992) (holding "decisions of police officers to engage in and to continue vehicular pursuit of fleeing criminal suspects are protected by official immunity"). A number of other cases, decided on common law principles, relieve police officers of liability based on reasoning concerning proximate cause similar to that found in *Roll, supra,* 94 *N.J.Super.* 530, 229 *A.*2d 281. See, *e.g., Estate of Warner v. United States,* 754 *F.Supp.* 1271 (N.D.Ill.1990) (applying Illinois law); *Doran v. City of Madison,* 519 *So.*2d 1308, 1314 (Ala.1988); *Kerwin v. County of Broome,* 134 *A.D.*2d 812, 521 *N.Y.S.*2d 871, 872 (1987), *appeal denied,* 71 *N.Y.*2d 802, 527 *N.Y.S.*2d 768, 522 *N.E.*2d 1066 (1988); *Lewis v. Bland,* 75 *Ohio App.*3d 453, 599 *N.E.*2d 814 (1991); *Kelly v. City of Tulsa,* 791 *P.*2d 826, 828 (Ok.App.1990); *Jackson v. Olson,* 77 *Or.App.* 41, 712 *P.*2d 128, 130–31 (1985), *review denied,* 300 *Or.* 605, 717 *P.*2d 1182 (1986); *Nevill v. City of Tullahoma,* 756 *S.W.*2d 226, 233 (Tenn.1988); *DeWald, supra,* 719 *P.*2d at 649–50. These cases, however, offer no guidance in our interpretation of the immunity provisions of the New Jersey Tort Claims Act.

We note that in *Wood, supra,* 218 *N.J.Super.* 11, 526 *A.*2d 1093, the officer was also held potentially liable for injuries caused when his vehicle rammed the car driven by the suspect fleeing arrest. Without implying any opinion, we note that the immunity provided by section 5–2b(2) was not at issue. The court ruled that section

3–3, the good faith immunity, was generally applicable but that summary judgment was not warranted.

## IV

The Appellate Division also based its affirmance of the trial court's grant of summary judgment on this good faith immunity, ruling that the facts before the trial court had failed to raise any genuine issue concerning good faith, relying on the trial court's statement that "there is no suggestion by anyone that Patrolman Cramer either initiated pursuit or continued it in bad faith," although the trial court never ruled on the section 3–3 immunity. Given our ruling on section 5–2b(2), we need not decide this issue. We note serious questions, however, whether summary judgment was appropriate. We accept, for the moment, our present decisional law to the effect that the good faith immunity has two parts, the first making it available where defendant's actions were "objectively reasonable," and using the same analysis on that issue as is used in federal civil rights cases (42 *U.S.C.A.* § 1983; see *Hayes v. Mercer County,* 217 *N.J.Super.* 614, 620–21, 526 *A.*2d 737 (App.Div.) *certif. denied,* 108 *N.J.* 643, 532 *A.*2d 226 (1987)), and the second, assuming objective reasonableness is not shown, subjective good faith. Our dictum in *Bombace, supra,* 125 *N.J.* at 374, 593 *A.*2d 335, appears to have adopted this approach. We are not certain, based on our reading of the record, that the facts in this matter, not all of which are mentioned in the various opinions, satisfied the showing required to support a summary judgment, even acknowledging that the standard applied in section 1983 cases encourages summary judgments so that government not only will have the theoretical benefit of good faith immunizing principles but will have them in fact by being relieved of the heavy burden of litigating the issue. See *Harlow v. Fitzgerald,* 457 *U.S.* 800, 818, 102 *S.Ct.* 2727, 2741, 73 *L.Ed.*2d 396, 410 (1982).

We need not deal here with cases asserting both section 1983 liability and liability under the Tort Claims Act, or the possible impact of one on the other. Both causes of action have something

similar to a good faith defense in the law enforcement context, including the high speed chase context. See, *e.g.*, *Fagan v. City of Vreeland*, 804 *F.Supp.* 591, 601 (D.N.J.1992) (dismissing claims brought under section 1983 because officer's involvement in high speed chase did not "shock the conscience," and dismissing tort claims under Tort Claims Act for lack of jurisdiction).

 We also reiterate that the Tort Claims Act immunity is subject to an outer limit, willful misconduct by a public employee being expressly excluded from the scope of the Act's immunity. *See N.J.S.A.* 59:3–14a. Apparently, however, even with its exclusion of immunity in cases of willful misconduct, the Act may create a broader sphere of immunity than the good faith standard applicable in section 1983 cases. Whatever the congruency of the two kinds of claims may or may not be, we note their independence from each other. *Hayes, supra*, 217 *N.J.Super.* at 619, 526 *A.2d* 737. The section 1983 claims may succeed or fail on the merits of that federal law, regardless of whether they fail or succeed under the Act. *Mancini v. Lester*, 630 *F.2d* 990, 994–95 (3d Cir.1980). And the claims under the Act may succeed or fail on the merits of the Act, regardless of whether they fail or succeed under section 1983. We emphasize only that whatever the immunity conferred by the Act, public entities and law enforcement personnel should understand that federal liability under section 1983 may exist, even if inconsistent with the Act, and if it does, the Act provides no immunity from the federal claim.

V

 Justice Clifford's concurring opinion would limit immunity in ordinary Motor Vehicle police pursuit cases to those in which the driver is "resisting arrest." We agree that section 5–2b(3), the "resisting arrest" section, may provide immunity in such situations, indeed, a plenary factual hearing might support its application to this case. We disagree, however, as noted *supra* at 360–363, 627 *A.2d* at 1097–1099 with the conclusion of the concurrence that section 5–2b(2) (the "escaping person" immunity) does *not*

cover the ordinary police pursuit situation. The concurrence impels us to add some further observations on its contention that the "resisting arrest" immunity is the *only* immunity that is applicable to police pursuit of someone not previously confined.

The determination whether a person is resisting arrest under the Act depends on the resolution of what are currently somewhat unclear legal and factual issues (discussed below), issues not necessarily related to the purposes of the immunity. California noted a similar problem when its original provision immunizing injuries only when caused by an "escaped prisoner" was construed not to apply to an arrested person who flees. *Ne Casek v. City of Los Angeles,* 233 *Cal.App.*2d 131, 43 *Cal.Rptr.* 294 (1965). In response to that case, the California legislature expanded the scope of the immunity to include injuries caused by "an escaping or escaped arrested person" and "a person resisting arrest." See *Kisbey, supra,* 204 *Cal.Rptr.* at 431, 682 *P.*2d at 1096. As the California Supreme Court later explained in *Kisbey,* the purpose of the amendment was not only to avoid the quibbling about what constituted a prisoner, but to expand the immunity to those technically arrested who attempt to flee from police, and even to those situations in which the police intended no arrest but simply temporary detention. *Ibid.* Indeed, after the amendment some of the California cases afforded police immunity by referring to both of the new sections without specifying which one applied. *City of San Jose, supra,* 212 *Cal.Rptr.* at 664 (holding police immune in high speed chase without specifying whether immunity flows from "escaping" or "resisting arrest" subdivision); *Duarte, supra,* 161 *Cal.Rptr.* at 142–43 (same). This approach of the California courts—using both sections of the broadening amendment—gave effect to the legislative intent

of preventing a case [from falling] between the cracks of the immunity because, for example, the police had not intended a full arrest—as distinguished from a temporary detention—when the subject fled, or because at the time of the escape the process had not reached the point of physical control over the suspect.

[*Kisbey, supra,* 204 *Cal.Rptr.* at 431, 682 *P.*2d at 1096 (see quotation above *supra* at 362, 627 *A.*2d at 1098).]

The danger of such gap in coverage results from giving a technical meaning to "arrest" or "resisting." *Ibid.* In New Jersey we took a further step designed to eliminate the possibility of a gap in immunity coverage resulting from technical definitions by eliminating even the "arrest" qualification, thereby making the immunity applicable to *any* "escaping person" and clearly covering the ordinary situation of the driver who is obviously eluding a police officer, regardless of whether he is arrested or resisting arrest.

The concurrence provides a helpful reminder of the desirability of relying on both sections 5–2b(2) and 5–2b(3) in finding immunity where appropriate. This is what some of the California cases have done, and what the trial court did in this case. Indeed, the Appellate Division, while ruling squarely that section 5–2b(2) provided immunity ("escaping person"), implies that section 5–2b(3) might also apply ("resisting arrest"). 254 *N.J.Super.* at 648 n. 1, 604 *A.*2d 183. The analysis of the concurrence, however, leads to a conclusion that would totally deprive the police of immunity in many pursuit cases, we suspect most, leaving only the good faith immunity, one obviously subject to the uncertainty of a jury verdict. Under the reasoning of the concurrence, immunity will not attach if the officer is pursuing a vehicle in order to stop or detain it—but not to arrest the driver. Nor will it apply even if an arrest is intended if the driver does not know it. The essence of the common law definition of "resisting arrest" is "flight knowingly intended to prevent a police officer from effecting an arrest of the fugitive." See *State v. Blanton,* 166 *N.J.Super.* 62, 71, 398 *A.*2d 1328 (App.Div.), *certif. denied* 81 *N.J.* 265, 405 *A.*2d 810 (1979). The same essential elements appear to be included in the Code's version of the crime (*N.J.S.A.* 2C:29–2a). Under that definition, however, what is clearly *not* immunized are the ordinary situations when a police officer pursues a vehicle without any intent to arrest but merely to stop the vehicle, detain it, and issue a ticket. At the time the Act was adopted, those situations were covered by *N.J.S.A.* 2A:170–25.8, and now by *N.J.S.A.* 2C:29–2b, under the offense commonly referred to as "eluding an officer":

Any person, while operating a motor vehicle on any street or highway in this State, who knowingly flees or attempts to elude any police or law enforcement officer after having received any signal from such officer to bring the vehicle to a full stop is a disorderly person [4] * *.

[*N.J.S.A.* 2C:29–2b.]

Given the definition of "resisting arrest," an analysis of the conclusion of the concurrence that summary judgment should have been granted on that ground underlines its inappropriateness as the sole basis for immunity. There was no showing, and certainly no finding, that Officer Cramer intended to arrest Logan when he first started to follow him, or even when he turned on his flashing lights and activated his siren, and no showing that Logan knew that an arrest was intended rather than the ordinary stop. Had the accident occurred at that point, there would probably be no "resisting arrest" immunity, certainly not on a motion for summary judgment. Perhaps as the vehicles accelerated, the speed might have reached a point where one might infer that the officer's intent simply to stop and ticket the offending driver was transformed into an intent to arrest, and that the driver's understanding similarly changed. Whatever that point was, under the analysis of the concurrence, immunity would have attached. It is indeed a fluid immunity not likely to encourage aggressive law enforcement. It is most fragile, and it is precisely that kind of technicality, a factual one suggested above, that led to the adoption of the two added sections in the California act, and the same sections, further expanded to avoid any technicalities, in our Act. When these factual complications are combined with the legal intricacies necessarily involved, one begins to realize the unsuitability of "resisting arrest" as the exclusive legislative means of providing such an immunity. We are faced not only with the problems related to "arrest" mentioned by the California Supreme Court in *Kisbey,* but with the added problems in New Jersey of whether "resisting arrest" should be held to refer to the common law crime, or to the codification of that crime, *N.J.S.A.* 2C:29–2a, not necessarily the same. In 1972 there was reason to believe that the common law crime required force to constitute "resisting

arrest," *State v. Blanton, supra,* having dispelled that notion only in 1979, a conclusion never passed on by this Court. The concurrence itself adds complications that probably do not really exist, such as whether probable cause existed—irrelevant to the "resisting arrest" offense—opening up a plentiful supply of uncertainty. See *State v. Mulvihill,* 57 *N.J.* 151, 155, 270 *A.*2d 277 (1970). Certainly, the mere existence of probable cause will not convert what would otherwise be an ordinary stop into a situation that constitutes "resisting arrest." Most drivers ticketed for speeding have no idea that they are "resisting arrest," nor do most officers intend any such arrest.

These distinctions, both factual and legal, involved in determining whether a person was resisting arrest make that category an unlikely legislative choice as the exclusive determinant of police immunity in pursuit cases. It may conceivably apply in some cases, but the purposes of the immunity will be better served by applying section 5–2b(2), the "escaping person" category. That subsection, as we construe it, includes the former offense of "eluding the police," whereas "resisting arrest" was always a separate and distinct offense both before and after adoption of the Code of Criminal Justice. Although the two offenses are now grouped in the same section of the Code, they are still clearly distinct and separate (resisting arrest being *N.J.S.A.* 2C:29–2a, eluding an officer being *N.J.S.A.* 2C:29–2b). The concurrence's definition of the "resisting arrest" offense clearly does not cover eluding an officer.

We noted above our conclusion that *Roll v. Timberman,* the case that caused the dispute that led to the conflict in Appellate Division decisions requiring certification of this case, afforded absolute immunity under common law for injuries resulting from police pursuit. *Supra* at 357–358, 627 *A.*2d at 1095–1096. An additional anomaly of the concurrence, therefore, is that it would somehow construe an immunity provision (section 5–2b) to diminish an immunity provided by common law, this despite the well understood intent of the Act to incorporate all common law immunities.

The concurrence mistakes our use of *Burg, supra,* 147 *N.J.Super.* at 312–13, 371 *A.*2d 308. *Burg* is cited simply as a case that recognizes the applicability of section 5–2b immunities despite the existence of concurring negligence on the part of the public entity or employee in causing the injury. We cite it in response to the language (and sometimes the holding) of other cases suggesting that such immunity exists only when injury is caused by the *sole* negligence of the person who is pursued—in other words, only when there is *no* negligence on the part of either the public entity or employee. That is a major theme intended to be dispelled by this decision. See *supra* at 362–366, 367–368, 627 *A.*2d at 1098–1100, 1100–1101. The analysis, including the analysis of *Burg,* is not at all directed to the question treated in *Fielder*—the effect on immunity where the injury results from a collision with a police vehicle rather than with the escaping person's vehicle. We note in our analysis of *Burg,* and in our conclusion that immunity attaches even where there is negligence on the part of the public entity or the public employee that combines with that of the fleeing person to cause the injury, that in that respect, we read section 5–2b much in the same way as section 5–2a is written, "despite the difference in language, so that neither a public entity nor a public employee is liable for an injury resulting from the escape or from the escaping of a prisoner or a person." *Supra* at 364–366, 367–368, 627 *A.*2d at 1099–1100, 1100–1101. While such a reading *might* lead to questioning the result in *Fielder,* we nowhere suggest it as the basis for such a consequence.

## VI

Our holding today immunizes police officers absolutely, absent willful misconduct, for all injuries arising out of their pursuit of a fleeing vehicle, even those that would not have occurred but for the negligence of the pursuing officer. It is based on our conclusion that the immunity was intended by the Legislature to be absolute in order to encourage vigorous law enforcement.

A difficult policy question involved in this legislative choice between aggressive law enforcement and the numerous injuries alleged to be unjustified continues to rage. That legislative choice has been accompanied by increasing efforts by the State to minimize the frequency and dangers of unwarranted or reckless police pursuits. Those efforts include the formulation of detailed standards by the Attorney General relating to both their initiation and termination as well as to the actual conduct of such pursuits. See Report of the Attorney General's Task Force on Police Vehicular Pursuit (April 1993). The recommendations of the Task Force include intensive training of police throughout the state. The Task Force's recommended guidelines provide that all officers shall attend vehicular pursuit training twice annually. In addition, a report is to be filed with the county prosecutor or, in the case of certain law enforcement agencies, with the Director of the Division of Criminal Justice confirming pursuit training of all police officers in conjunction with semi-annual firearm requalification and the use of force training. *Id.* at 64–65. In short, the State through the Attorney General's Office, which appeared before us in support of today's absolute immunity ruling, believes it can protect both the motorists and pedestrians from unnecessary injury while at the same time protecting the police from liability.

Nothing we have said prevents the State through the Attorney General's Office, the Prosecutors' Offices, the various Chiefs of Police, from continuing to train officers in the appropriate response to pursuit situations. While tort liability might indeed have an effect on their conduct, the absence of tort liability does not prevent training that attempts to balance the need for apprehension against the need for safety.

We affirm the judgment of the Appellate Division.

O'HERN, J., concurring.

I join the Court's opinion upholding the dismissal of this action on the basis that *N.J.S.A.* 59:5–2b(2) (section 5–2b(2)) affords immunity under the Tort Claims Act (the Act) to public officers

and public employers when an injury is caused by "an escaping or escaped person." I would have preferred that the dismissal be upheld on the basis of the immunity afforded under *N.J.S.A.* 59:3–3 (section 3–3) (the law-enforcement immunity). That section states in part: "A public employee is not liable if he acts in good faith in the execution or enforcement of any law." That immunity would exonerate the employer as well.

The law-enforcement immunity was the first basis for affirmance set forth in the Attorney General's brief, and I believe that a holding under section 3–3 would be more consistent with the internal structure and language of the Act. In fact, the immunities the two sections confer will likely converge when the contents of the "willful misconduct" and "good faith" exceptions to each immunity are filled out.

For although the issue of immunity arises here in the context of a high-speed car chase, the principle of decision is equally applicable to other uses of force to apprehend an escaping person. Those involved in law enforcement from the Attorney General on down realize that statutory and constitutional limits on the use of governmental force apply in such circumstances. Specifically, in the context of the section 5–2b(2) immunity, the Court recognizes that all immunities for public officers under the Act are "subject to an outer limit, willful misconduct by a public employee being expressly excluded from the scope of the Act's immunity." *Ante* at 375, 627 *A.*2d at 1105. To suggest the law were otherwise could result in exposing police officers to criminal and civil liability and exposing, as well, the officer and the officer's employer to civil liability for violation of the federal constitutional rights of injured persons.

Furthermore, that constitutional limits exist on the use of governmental force to subdue escaping persons is now well settled. In *Tennessee v. Garner*, 471 *U.S.* 1, 105 *S.Ct.* 1694, 85 *L.Ed.*2d 1 (1985), the Supreme Court held that a law-enforcement officer could not use deadly force to apprehend a fleeing suspected felon who was neither armed nor dangerous, and who did not pose

a significant threat to public safety. A high-speed police pursuit that results in the fleeing person's death in a police roadblock also may expose the officer and the public entity to liability. *Brower v. County of Inyo*, 489 *U.S.* 593, 109 *S.Ct.* 1378, 103 *L.Ed.*2d 628 (1989). "[I]t [is] enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599, 109 *S.Ct.* at 1382, 103 *L.Ed.*2d at 637.

Municipalities and local-government units will undoubtedly promulgate standards aimed at providing the police with guidelines concerning the appropriate time to commence and to terminate pursuits. Some commentators believe such guidance is overdue. "High-speed vehicle pursuits are possibly the most dangerous of all ordinary police activities. Far more police vehicle chases occur each year than police shootings. However, development of legally sound police vehicle pursuit policies lags behind development of deadly force policies involving firearms." Hugh Nugent et al., *Restrictive Policies for High–Speed Police Pursuits*, at 23 (National Institute of Justice, Issues & Practices Series No. 122025) (*Restrictive Policies* ). Municipalities may be sued directly for inadequate training and a failure to provide police-pursuit guidelines as "persons" to whom the provisions of 42 *U.S.C.* § 1983 apply. If the "chase" policy implemented or the omission to consider any set of policy guidelines reflects a level of deliberate indifference to the violation of protected rights, the local-government unit may be held liable to injured persons under federal law. In determining instances in which the training may prove to be inadequate to safeguard the constitutional rights of persons, the Supreme Court has said:

> But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.
>
> [*City of Canton v. Harris*, 489 *U.S.* 378, 390, 109 *S.Ct.* 1197, 1205, 103 *L.Ed.*2d 412, 427 (1989).]

Some have read the *Garner, Harris* and *Brower* cases to raise a real possibility of government-entity liability under federal law in the high-speed pursuit context.

> Deliberate indifference to constitutional rights may be a standard few plaintiffs will ever meet. Indeed, Justice O'Connor did not believe that Mrs. Harris, the plaintiff in the *City of Canton*, could meet the deliberate indifference standard. But the risks inherent in high-speed pursuits are well known and cannot be taken lightly. As the facts of *Brower v. County of Inyo* make clear, high-speed pursuit can turn out to be the use of deadly force, as did the use of firearms in *Tennessee v. Garner*. Moreover, under *Garner*, a municipality may be liable for failing to have a policy limiting high-risk pursuits to circumstances justifying the risk. And under *City of Canton*, local governments may find themselves liable for failure to provide training that constrains this application of deadly force.
>
> [Nugent, *supra, Restrictive Policies* at 5.]

The Report of the Attorney General's Task Force on Police Vehicular Pursuit, at 1 (April 1993) (Task Force Report) raises similar concerns at the state level:

> The necessity for guidance [of police conduct] is particularly acute in the area of police vehicular pursuits of suspected violators of the law. A car chase often contains elements of danger, not only to the pursuer and the pursued, but also to uninvolved pedestrians and motorists using the roadways of this State.

The report further concludes: "The existence of a vehicular pursuit policy narrowing law enforcement discretion may not only curtail litigation by decreasing the number of pursuits, but may also be a useful tool for public employees and entities faced with defending lawsuits for damages arising from pursuits of suspected offenders." *Id.* at 1–2.

Under either the section 5–2(b)(2) (escaping person) or the section 3–3 (law enforcement) immunity, whether the pursuing police car or the suspect's car strikes the innocent vehicle or pedestrian would make no difference to me. In either case, absent willful misconduct or a lack of good faith, statutory immunity will be provided for police officers engaged in vehicular pursuits. To rule otherwise, in the words of the Task Force Report,

> will force officers into a position where doing what is right is subordinated to doing what is most insulated in terms of exposure to liability. "In their routine work, police officers must be free to make split-second judgments in good faith based on their experience and training without fear of personal liability." *Travis v. City of Mesquite*, 830 *S.W.*2d 94, 103 (Tex.1992) (Cornyn, J., concurring).

[*Id.* at 8.]

CLIFFORD, J., concurring in judgment.

The Court and I reach the same result by different routes. The majority opinion holds that the public employee, defendant Cramer, and the public entities, defendants City of Wildwood and its Police Department, gain immunity under *N.J.S.A.* 59:5–2b(2). That statute affords immunity when an injury is "caused by an escaping or escaped person." Because I disagree with the Court's characterization of defendant Logan, whom Cramer was chasing, as an "escaping or escaped person," I conclude that one must look elsewhere in the Tort Claims Act for an "immunity" provision. I find it in *N.J.S.A.* 59:5–2b(3), which provides immunity for "any injury caused by * * * a person resisting arrest." Had I not concluded that Logan was "resisting arrest," I would nonetheless find immunity in *N.J.S.A.* 59:2–1b and *N.J.S.A.* 59:3–1b, which incorporate existing common-law public-entity and public-employee immunity, when an innocent third party is injured by a suspect evading police pursuit.

I

The definition of "escape" as first codified under *N.J.S.A.* 2A:104–1 to –12, and later defined under the New Jersey Criminal Code, *N.J.S.A.* 2C:29–5, requires "confinement" or "official detention." Before the pursuit Logan had not been under the control of any law-enforcement agency; therefore he fails to qualify as an "escaping" person under *N.J.S.A.* 59:5–2b(2).

On the other hand, "purposely prevent[ing] a law enforcement officer from effecting a lawful arrest" constitutes resisting arrest. *N.J.S.A.* 2C:29–2a; *State v. Battle,* 256 *N.J.Super.* 268, 284, 606 *A.*2d 1119 (App.Div.), *certif. denied,* 130 *N.J.* 393, 614 *A.*2d 616 (1992); *see, e.g., State v. Doss,* 254 *N.J.Super.* 122, 130, 603 *A.*2d 102 (App.Div.) (concluding that defendant resisted arrest when police, with articulable suspicion, attempted to stop him and he refused to obey commands to halt), *certif. denied,* 130 *N.J.* 17, 611 *A.*2d 655 (1992). Officer Cramer had the necessary probable

cause to arrest because he believed that a hammer had been thrown at him from the Logan vehicle. Moreover, pursuant to *N.J.S.A.* 39:5–25, an officer may make an arrest without a warrant for violations of any provision of chapter 3 or, with but few exceptions, chapter 4 of Title 39 (Motor Vehicle and Traffic Regulations) committed in that officer's presence. Logan violated both *N.J.S.A.* 39:3–47, by not having his headlights illuminated at night, and *N.J.S.A.* 39:4–64, by his presumptive responsibility for the throwing of an "object" from his vehicle. In some different context I might require, for summary-judgment purposes, a categorical statement by the pursuing officer of his intention to effect an arrest; but in the situation presented by this case, so graphically portrayed in the Court's opinion, *ante* at 351–352, 627 *A.*2d at 1092–1093, we can safely conclude as a matter of law that Cramer most surely would have placed Logan under arrest. Therefore, because Logan continued to flee while knowing that a police officer was chasing him, and because that officer had probable cause to arrest Logan and intended to do so, public-entity and public-employee immunity is more appropriately found under *N.J.S.A.* 59:5–2b(3).

In police-pursuit cases in which the circumstances are not so clear that the pursued is "resisting arrest," I would turn to existing case law. Under *Roll v. Timberman,* 94 *N.J.Super.* 530, 229 *A.*2d 281 (App.Div.), *certif. denied,* 50 *N.J.* 84, 232 *A.*2d 147 (1967), incorporated into the Tort Claims Act under *N.J.S.A.* 59:2–1b and *N.J.S.A.* 59:3–1b, a public entity and public employee are immunized when an innocent third party is injured by a suspect fleeing a pursuing police officer. In that limited respect, I support so much of the Court's analysis of *Roll* as appears *ante* at 357–359, 627 *A.*2d at 1095–1096 (but not as paraphrased later, *ante* at 379, 627 *A.*2d at 1107), and the Court's application of *Roll* to this case, *ante* at 358–359, 627 *A.*2d at 1096–1097.

## II

The Court sweeps into the immunity provided in *N.J.S.A.* 59:5–2b(2), the situation in which the third-party's injury is caused by

the *escape* rather than the *escaping person.* Discussing *Burg v. State,* 147 *N.J.Super.* 316, 371 *A.*2d 308 (App.Div.), *certif. denied,* 75 *N.J.* 11, 379 *A.*2d 242 (1977), the majority concludes that public-employee and public-entity immunity exists for "*all* acts of negligence related to the injuries caused by the escape, whether those of the employee or the entity * * *." *Ante* at 365, 627 *A.*2d at 1106. The Court offers *Burg* "in response to the language (and sometimes the holding) of other cases suggesting that such immunity exists * * * only when there is *no* negligence on the part of either the public entity or employee." *Ante* at 377, 627 *A.*2d at 1106.

Although I agree with the Court's point that immunity may exist when both the pursued and the public entity or public employee act negligently, I do not agree with the Court's sweeping application of that point and its overbroad interpretation of *Burg.*

In *Burg,* a convicted felon who was serving a life term was on vocational, noncustodial release when he assaulted the plaintiff. 147 *N.J.Super.* at 318, 371 *A.*2d 308. The plaintiff then sued the State as well as State employees. The plaintiff's cause of action was based on the State's handling of the prisoner. Evaluating the applicability of *N.J.S.A.* 59:5–2a and –2b(1), the court looked for guidance to two California decisions, because our Tort Claims Act was modeled after California's statute. In both California cases the defendants had caused the injuries and damage. In one of the cases immunity was founded on a section similar to *N.J.S.A.* 59:5–2a, and in the other immunity was based on a section similar to *N.J.S.A.* 59:5–2b(2). Applying immunity, the California courts refused to distinguish between ministerial and discretionary acts or between acts of omission or commission. The *Burg* court concluded that

since the facts alleged by plaintiffs amount essentially only to an assertion that [the prisoner] should not have been permitted to participate in the work release program, liability should not attach for any injury resulting from his release. It is clear that *N.J.S.A.* 59:5–2(a) expressly excludes such a claim as the basis for a cause of action.

[147 *N.J.Super.* at 325, 371 *A*.2d 308.]

The court further noted that alternative immunity existed under *N.J.S.A.* 59:5–2b.

The Court correctly concludes that *Burg* "indicated it would immunize *all* acts of a public entity or a public employee in connection with section 5–2b—there 'an escaping or escaped prisoner.'" *Ante* at 365, 627 *A*.2d at 1100. However, that conclusion does not lead to the further proposition that immunity exists for "*all* acts of negligence related to the injuries caused by the *escape.*" Ibid. (second emphasis added). What does follow is that immunity exists for àll acts of negligence, whether those of the escapee independently or in conjunction with those of the public employee, related to the injuries caused by, in the language of the statute, the *escaping or escaped person.*

*N.J.S.A.* 59:5–2a provides immunity for "*[a]n injury resulting from* the parole or release of a prisoner * * *." (Emphasis added.) On the other hand, *N.J.S.A.* 59:5–2b(2) provides immunity for "any injury caused *by* * * * an escaping or escaped person." (Emphasis added.) In the first instance, I would conclude that the Legislature sought to provide a more expansive immunity to public entities and public employees than would be afforded had the language been limited to "an injury caused by a parolee or releasee." The Legislature's use of the phrase "caused by * * * an escaping or escaped person" in section 5–2b, rather than the phrase "resulting from the escape," represents a considered choice. I would recognize that choice by holding that in *N.J.S.A.* 59:5–2b the Legislature carved out a narrower immunity than is provided by *N.J.S.A.* 59:5–2a: public-entity and public-employee immunity exists only if the injury is caused by the escaping or escaped person, whether or not the public employee was concurrently negligent; such immunity is not afforded if the injury resulted from the escape.

### III

I concur in the Court's judgment affirming the judgment of the Appellate Division.

Justices HANDLER and POLLOCK join in this opinion.

Justices CLIFFORD, HANDLER, POLLOCK and O'HERN concur in result.

*For affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —none.